**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SCHOOL DISTRICT OF PHILADELPHIA** | **CIVIL ACTION** |
| **v.** | **NO. 15-4501** |
| **JOHN POST, et al.** | |

**Baylson, J.**                                                                                   **July 5, 2017**

<u>**MEMORANDUM RE: CROSS MOTIONS FOR PARTIAL JUDGMENT ON THE**</u>
<u>**ADMINISTRATIVE RECORD**</u>

## I.      INTRODUCTION

This case arises under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of

the Rehabilitation Act ("RA"), and the Americans with Disabilities Act ("ADA"). John and Marissa

Post (collectively, "Parents") filed a due process complaint against the Philadelphia School District

("District") alleging that it failed to provide their son, D.P., a free, appropriate public education

("FAPE"), discriminated against him because of his disability, and retaliated against them for their

advocacy on behalf of D.P. The Administrative Hearing Officer concluded that the District had denied

D.P. a FAPE and had discriminated against D.P., but that it had not retaliated against Parents.

Presently before the Court are the parties' cross motions for partial judgment on the administrative

record. Having considered the parties' briefing and the administrative record, we affirm the findings

of the Hearing Officer and therefore grant Parents' motion, and deny the District's.

## II.     FACTS

### A.  Background

D.P. is currently a second-grade student who was diagnosed with Autism Spectrum Disorder

("ASD") at the age of four. (H.O. Rpt. ¶ 6.) The chain of events relevant to the instant motions

occurred during the lead up to D.P.'s entry into kindergarten in September 2014. Following his ASD diagnosis, D.P. was evaluated by an early intervention service provider who concluded that he was eligible for early intervention services, which are provided to children in Pennsylvania birth to age five with developmental delays and disabilities. (Id. ¶ 7.) In January 2013, an Individualized Family Service Plan/Individualized Education Program ("Early Intervention IEP") was developed, which indicated that D.P.'s behavior did not impede his own learning or that of others and which included support services for D.P. in a regular preschool environment. (Id. ¶ 8.) The Early Intervention IEP also included a plan for D.P.'s transition to kindergarten programming. (Id. ¶ 9.)

During the 2013-2014 school year D.P. attended two typical preschools at which he received early intervention services. (Id. ¶ 10.) D.P.'s behavior throughout that school year was generally on par with that of his peers, and his teachers noted that he was an observational learner who benefitted from modeling his behavior after his classmates'. (Id. ¶¶ 3, 10.)

### B. Transition from Pre-School to Kindergarten

As the time came for D.P. to transition to kindergarten, Parents attempted to register him at McCall School but were rebuffed by the school secretary, who told them that because the family lived outside the geographic area served by the school, D.P. could not attend. (Id. ¶¶ 4, 12; N.T. 1021.) Parents set up a meeting with McCall's principal, Rose Rock, to sort out the issue. (N.T. 1021.) Principal Rock invited Brian Siket, Director of Special Services for the "Learning Network" of which McCall is a part, to attend the meeting, as well. (N.T. 1024.) Mr. Siket stated at the meeting that "McCall could not support an autistic child" and that it would be in the best interest of the family "to send [D.P.] somewhere else that had the services." (Id. 1022-1023.) Nevertheless, Principal Rock agreed at that meeting to register D.P. at McCall. (H.O. Rpt. ¶ 12; N.T. 1024-1025.)

In June 2014, Todd Mendelsohn, a District psychologist, was asked to evaluate D.P. as part of

D.P.'s transition from early intervention to the District. (H.O. Rpt. ¶ 19; N.T. 277.) The result was a

Psychoeducational Reevaluation Report ("PRR"), which found D.P. eligible for special education on

the basis of ASD, "evidenced by a previous diagnosis of autism and current results from the

[Childhood Autism Rating Scale, Second Edition (CARS2)] confirming the previous diagnosis."

(H.O. Rpt. ¶¶ 21-22; S-3 at 3.) Many of Dr. Mendelsohn's recommendations in the PRR were based

on D.P.'s ASD diagnosis rather than on the doctor's specific observations of D.P. (N.T. 299 (stating

"[t]hese are general recommendations I make for most students with autism"); H.O. Rpt ¶¶ 21-22; see,

e.g., S-3 at 4 ("Although the student with ASD may be able to learn ordinary rote academic skills,

special attention must be given to the application of skills such as math and reading to practical tasks

like independently buying an ice cream and getting the correct change.").) Dr. Mendelsohn's primary

recommendation was that D.P. "may require a highly structured program with an emphasis on the

systematic presentation of materials, with a small class size and student: teacher ratio which permits

considerable personalized attention." (S-3 at 4.) Dr. Stephen Wong, another school psychologist

involved in determining D.P.'s kindergarten placement, "read that as a recommendation for placement

in an autistic support class," which often, although not always, means the child is placed in a separate

classroom from the general education students. (N.T. 343-346.) It can also refer to a curriculum

whereby an autistic support teacher consults with the general education teacher and advises him

regarding how to support the student. (Id.)

Shortly thereafter, on June 17, 2014, the District issued D.P.'s Reevaluation Report ("RR").

An RR provides a more holistic assessment of the student and his needs than that provided by the PRR

insofar as it includes data from "other specialists and related service providers such as speech and

occupational therap[ists]." (H.O. Rpt. ¶ 24; N.T. 335.) The RR issued for D.P. incorporated Dr.

Mendelsohn's recommendations verbatim, and concluded that D.P. was eligible for special education

on the basis of ASD and a speech/language impairment. (H.O. Rpt. ¶ 24; S-4; N.T. 311.) Because McCall did not offer the type of autism support the RR deemed necessary, the report's conclusions meant that D.P. would have to attend a different school. (N.T. 1153-1158.) Parents were extremely upset about this and requested that a new PRR be written.

The District agreed to do so. On September 12, 2014, Dr. Wong issued the revised PRR, which incorporated Parents' input, including their request for full inclusion in the general curriculum for D.P., as well as supplementary information from D.P.'s preschool and early intervention service providers and his pediatric neurologist. (H.O. Rpt. ¶¶ 27-28, 30; N.T. 158-159.) Nevertheless, the report still maintained all of Dr. Mendelsohn's original recommendations, the primary one being that D.P. needed autistic support incapable of being provided at McCall. (N.T. 337-346 (Dr. Wong stating that "if I haven't evaluated the student, and you know, I have to stick with the . . . person that did the evaluation, I have to stick with his opinion. And in this particular case, I decided to keep that as is. I didn't want to alter his recommendations, if he had made these recommendations I didn't feel to change them"); S-6 at 10.) Following the issuance of the new PRR, the District also issued a new RR on the same day in which it came to the same conclusion as the original RR: D.P. was eligible for special education on the bases of ASD and a speech/language impairment. (S-7; H.O. Rpt. ¶ 31.)

At some point in September, District personnel convened to discuss D.P.'s placement and concluded that D.P. should be in a "blended program" that combined regular education with autistic support programming. (N.T. 359-360.) Such a program could not exist at McCall, which does not offer autistic support programming. (N.T. 359.) Shortly thereafter, another meeting was held regarding D.P.'s placement, this time with Parents present. At that meeting, Mr. Siket and all other District representatives maintained their position that McCall could not support D.P. and that D.P should be placed at Bache-Martin. (N.T. 1032-1033, 1170-71.)

## C. Development of an IEP

Meanwhile, a few weeks prior, in August 2014, Principal Rose had asked Tina Giangrante, a special education liaison at McCall, to "complete a draft IEP for [D.P.] for autistic support." (N.T. 480-81.) Principal Rose informed Ms. Giangrante that "[t]he level of support is unknown at this time." (N.T. 480-81.) Ms. Giangrante wrote the IEP based on the reevaluation reports and recommendations that had been completed for D.P. but she believed it would only be a draft IEP rather than the "be-all end-all product" because she felt she was working with limited information. (N.T. 482-83, 488; H.O. Rpt. ¶ 34.) She was unsure of whether the IEP should be drafted to recommend life skills support, which is what one does for students who will be placed in an autistic support program, but decided it should be, due to the psychologists' recommendations in the PRR and RR. (N.T. 484-87; H.O. Rpt. ¶ 34.) The draft IEP issued in September did not include the type and level of special education support to be provided. (S-5; H.O. Rpt. ¶ 35.)

On October 9, 2014, D.P.'s IEP team, including Parents, met to review the draft IEP and finalize it. (H.O. Rpt. ¶ 36.) The District representatives present reiterated their position that D.P. should be placed at Bache-Martin and there appears to have been minimal, if any, discussion of the possibility of providing D.P. with supplemental aids and services such that he could be educated in a regular education classroom. (N.T. 1175, 1179-80.) Parents expressed their concerns regarding D.P. attending Bache-Martin, and their desire that he stay at McCall, apparently in the process convincing Mr. Siket and others that D.P.'s draft IEP should be revised to be "based upon learning support" rather than autistic support. (N.T. 361, 499.) The following day, October 10, 2014, a new IEP was sent to Parents' attorney ("October IEP") recommending that D.P. be placed at McCall, where he would be in a regular kindergarten classroom for 48% of the school day and receive learning support for the other 52% of the day. (N.T. 1052, 1178; S-8 at 38.) Parents declined the placement because they felt it called for too much time removed from the general education class and because they did not "feel that

[they] ever really collaborated as a team about what would work for [D.P.]." (N.T. 1053, 179-80 (discussing lack of consideration of "[D.P.'s] needs and what is specific to him").)

### D. D.P.'s Kindergarten Curriculum

D.P. began kindergarten at McCall on the first day of the 2014-2015 school year without an up-to-date IEP having been finalized. (N.T. 87.) D.P.'s kindergarten teacher, Rachel Keenan, tried and failed to get in touch with Parents, as was her regular practice with all parents to incoming kindergarteners. (H.O. Rpt. ¶ 41; N.T. 203, 419-20.) Ms. Keenan knew that D.P. was entering her class with the Early Intervention IEP, which she states she implemented throughout the year. (N.T. 408-09, 411-12.) Ms. Keenan further explained that she consulted with various special education teachers regarding how to accommodate D.P., and that one such teacher provided one-on-one assistance to D.P. in class on several occasions. (N.T. 406-07.) In addition, Ms. Keenan accommodated D.P. by obtaining a special chair and a cushion so that D.P. would be more comfortable in class. (N.T. 406-10.)

D.P. exhibited some disruptive behavior at the beginning of the school year, such as lying on the carpet and exhibiting a fascination with bathrooms, and Ms. Keenan questioned whether he should be in her classroom. (N.T. 444-45.) Those behavioral issues resolved themselves quickly, and Ms. Keenan stated that she believed she was meeting his needs fully. (N.T. 432-33, 446-48.)

Unbeknownst to Parents, beginning in mid-October D.P. began being pulled out of the regular classroom for reading and mathematics instruction by a special education teacher because he was not as proficient in those areas as his peers. (H.O. Rpt. ¶¶ 50, 51; N.T. 148-49, 210-11, 739-50, 755-56.) These sessions took place between 45 and 90 minutes per day for a total of 360 minutes per week. (H.O. Rpt. ¶ 50.) Principal Post stated that the decision to pull D.P. out of regular education was made because the Response to Intervention ("RTI") team "thought that [D.P.] should have that service,"

even though it was not authorized by D.P.'s last agreed upon IEP. (N.T. 149.) Parents were apprised of this pullout instruction in January or February 2015, and first learned of its scheduling at the due process hearing. (N.T. 1074-75, 1206-07.)

Because an IEP had not been finalized for D.P., although D.P. met all of the goals in his Early Intervention IEP, those goals were never revised to reflect that outside of draft form and, in addition, no progress reports were generated for D.P. (H.O. Rpt. ¶¶ 52, 53; N.T. 758-59, 769-72.)

## III. PROCEDURAL BACKGROUND

Parents initiated this matter on December 21, 2014 by filing a due process complaint against the District in which they alleged that the District denied D.P. a FAPE under the IDEA, Section 504 of the RA, and the ADA. Specifically, Parents argued that the District failed to provide D.P. "an appropriate educational program in the least restrictive environment as [D.P.] made the transition to school-aged programming; that the District discriminated against [D.P.]; and that the District retaliated against . . . Parents." (H.O. Rpt. at 2.) The District countered that the special education program it provided for D.P. was appropriate and that it neither discriminated nor retaliated against Parents or D.P. After a four day evidentiary hearing, the Hearing Officer concluded that "the District denied [D.P.] [a] FAPE by failing to comply with its [least restrictive environment] obligations and that the District discriminated against [D.P.]." (Id. at 25.) The Hearing Officer ordered:

> (1) The District to convene a meeting of D.P.'s IEP team to revise his 2015-2016 school year IEP such that he would be placed in a regular classroom at McCall "to the maximum extent appropriate, utilizing the SAS Toolkit to determine appropriate supplementary aids and services." (Id. at 25.)

> (2) The District to provide D.P. compensatory education of 360 minutes per week for each week school was in session from the date of the initiation of the due process complaint, October 15, 2014, through the end of the 2014-2015 school year. (Id.)

The Hearing Officer found in favor of the District on the retaliation claim. (Id.) On July 20, 2015, the District appealed the Hearing Officer's decision by filing a Petition for Review in the Commonwealth Court of Pennsylvania, which Parents removed to this Court. (ECF 1.) Parents filed an Answer and Counterclaims on August 20, 2015, seeking:

(1) Enforcement of the Hearing Officer's order requiring the District to convene a meeting of D.P.'S IEP team to revise his 2015-2016 IEP;

(2) Compensatory damages as a remedy for the District's intentional violation of D.P.'s rights under Section 504;

(3) Attorneys' fees and costs.

On September 23, 2015, Parents filed an Amended Answer and Counterclaims in which they added a claim for retaliation, coercion and intimidation for Parents' advocacy on behalf of D.P.'s rights. (ECF 5.) The District filed an Answer on October 14, 2015, and an Amended Answer on November 2, 2015. (ECF 7, 8.) On February 10, 2017, the District moved for summary judgment on the counterclaims asserted by Parents (ECF 54), and on February 27, 2017, Parents responded (ECF 56).

## IV.    LEGAL STANDARDS

### A.  IDEA Framework

Under the IDEA, states receiving federal education funding must provide every disabled child with a "free appropriate public education," referred to as a FAPE. 20 U.S.C. § 1412(a)(1).[1] The Supreme Court has described a FAPE as consisting of "educational instruction specially designed to

---

[1] A FAPE consists of "special education and related services that –

   (A)  have been provided at public expense, under public supervision and direction, and without charge;

   (B)  meet the standards of the State educational agency;

   (C)  include an appropriate preschool, elementary school, or secondary school education in the State involved; and

   (D)  are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9).

meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 188-89 (1982). Central to the provision of a FAPE is the IEP, the "program of individualized instruction for each special education student" that is developed via collaboration between parents and schools. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005).

Critically, an IEP need not "provide 'the optimal level of services,' or incorporate every program requested by the child's parents" but rather need only, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Ridley, 680 F.3d at 269 (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010), Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009)) (internal quotations omitted). If parents believe that their child's right to a FAPE has been violated, the IDEA provides recourse in the form of an administrative due process hearing. 20 U.S.C. § 1415(f). Should either party be "aggrieved by the findings and decision" reached after such hearing, the IDEA further allows that party to file a civil suit in state or federal court. Id. § (i)(2)(A).

"The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." Ridley, 680 F.3d at 270. In evaluating the arguments of the party challenging the Hearing Officer's findings, the district court must base its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii).

**B. Standard of Review**

The Supreme Court has cautioned that the IDEA's provision of judicial review is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. To that end, the Court set forth a unique standard of review for district courts to use when reviewing the decisions of Hearing Officers in cases arising under the IDEA: "due weight" must be afforded to such decisions. Id. ("The fact that [20 U.S.C.] § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."). In this Circuit, the "due weight" standard entails a "modified de novo" review in which "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and the court must explain any rejection of them. Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)). In addition, credibility determinations must be accepted "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995). The Hearing Officer's legal conclusions are reviewed de novo. S.H., 336 F.3d at 270.

**V.    DISCUSSION**

    **A. Parties' Arguments**

        **(1)  District's Motion for Partial Judgment on the Administrative Record (ECF 53)**

First, the District argues that the Hearing Officer erred in ordering compensatory damages as a remedy because "[m]issing from the administrative record is any finding that [D.P.] failed to make progress in any domain." (District Mot. at 11.) The District focuses on the lack of a tangible impact to D.P. as a result of the District's actions, including its removal of D.P. from the regular classroom for

360 minutes a week for the 2014-2015 school year.  (Id.)  The fact that there was no demonstrable negative effect on D.P., according to the District, precludes imposition of compensatory education because such a remedy is intended "to compensate the child for the period of deprivation of special education services."  (Id. at 12.)  Therefore, the fact that D.P. was not deprived of special education services and suffered no "deleterious impact . . . as a result of the removal," compels the conclusion that compensatory education was not warranted.  (Id.)  Second, the District contends that the record does not support a finding that the District intentionally discriminated against D.P.  It states that D.P.'s removal from the regular kindergarten class was not due to D.P.'s ASD diagnosis but rather resulted from the Response to Intervention ("RTI") process, through which students with identified difficulties in certain areas are provided interventions to support them, separate and apart from any consideration of a disability diagnosis.  (Id. at 13.)  The District focuses on the "difficult situation" D.P.'s team encountered, in that the offered IEP was in dispute but D.P. was still "[coming] to school each day with certain needs . . . capable of being addressed through [the RTI process]."  (Id. at 14.)  It argues that D.P.'s removal from kindergarten to receive special education support was not related to his disability.  Id.  Finally, the District contends that the record supports the Hearing Officer's finding that there was no retaliation against Parents.  (Id. at 14-15.)

### (2)  Parents' Response to District's Motion (ECF 55) and Parents' Motion for Partial Judgment on the Administrative Record (ECF 50)

#### i.  Parents' Response (ECF 55)

Parents argue compensatory education was an appropriate award because the District denied D.P. his right to a FAPE by (1) unilaterally deciding to remove him from class, and (2) depriving him "the opportunity to participate with typical peers and engage in observational learning from them for a more than insignificant portion of the school day."  (Parents' Response at 5-6 (quoting H.O. Rpt. at 21).)  Parents dispute the District's contention that compensatory education is only warranted when a

"student's removal from the general education setting had a 'deleterious impact' on the student or resulted in a 'cessation of special education services.'" (Id. at 7 (quoting District Mot. at 12).) Parents further argue that D.P.'s removal from kindergarten was solely due to his ASD diagnosis, and that it was therefore an incident of disability-based discrimination. (Id. at 8-11.) Finally, Parents argue that the record supports their assertion that the District retaliated against them for their support of D.P.'s right to attend McCall. (Id. at 11-12.) They cite various acts by the District, including disallowing Ms. Post from volunteering in D.P.'s kindergarten class, threatening Parents with truancy charges, and removing Ms. Post as an officer in the Home-School Association. (Id. at 12-16.)

### ii.    Parents' Motion for Partial Judgment on the Administrative Record (ECF 50)

In their motion seeking partial judgment on the administrative record, Parents argue that the Hearing Officer correctly found the District did not provide D.P. a FAPE because the District:

> (1) Did not consider placing D.P. in a regular kindergarten with supplementary aids and services;
>
> (2) Developed D.P.'s IEP after deciding on a placement for D.P. rather than letting the placement decision be guided by the IEP;
>
> (3) Made recommendations based on D.P.'s diagnosis rather than "any meaningful consideration of [his] strengths and needs;" and
>
> (4) Did not sufficiently involve Parents in the decision-making process for D.P.'s program. (Parents' Mot. at 6-7 (quoting H.O. Rpt. at 17).)

As to their discrimination claim under Section 504 of RA and the ADA, Parents assert that the record supports the Hearing Officer's determination because the proposed IEP "excluded D.P. from general education classes for 52% of the school day because of his disabilities" and because the District "removed D.P. from the regular kindergarten for 45 to 90 minutes a day, in violation of his then-current IEP." (Id. at 16.) Parents further contend that the Hearing Officer's award of compensatory damages was appropriate as a remedy for the District's violation of the IDEA's mandate to provide a FAPE in the least restrictive environment. (Id. at 20-22.)

**B. Analysis**

  **(1) Did the Hearing Officer correctly find the District denied D.P. a FAPE by failing to adequately consider the least restrictive environment?**

  Denials of a FAPE can exist under varied circumstances, ranging from an IEP that is not "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential," to a school district's failure to include parents in educational decision-making concerning their children.  See Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 240 (3d Cir. 2009) (internal quotations omitted); 20 U.S.C. § 1414(e).

  Here, the Hearing Officer found the District to have denied D.P. a FAPE by its failure to educate him in the "'least restrictive environment' (LRE) which permits [him] to derive meaningful educational benefit."  (H.O. Rpt. at 14).  To come to that conclusion, the Hearing Officer applied Oberti v. Board of Education of Borough of Clementon School District, 995 F.2d 1204 (3d Cir. 1992), which delineated a two-part test for determining whether a school is in compliance with the IDEA's LRE, or "mainstreaming", requirement.  Id. at 1215.  First, the court must ascertain "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily."  Id. (quoting Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1048 (5th Cir. 1989)) (internal quotations omitted).  Second, if the court finds that for the child to benefit educationally he must be placed outside the regular classroom, "the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate.'"  Id. (quoting Daniel R.R., 874 F.2d at 1048).  Various factors inform the court's decision under the first prong, including (1) the extent to which the school endeavored to accommodate the child in a regular classroom, including with supplemental aids and services, (2) a comparison of the likely educational benefits to the child from the regular program opposed to those from a special education program, and (3) the possible detriment to other students of the child's inclusion in a regular classroom.  See id. at 1216-1217.  Importantly for the instant matter, where a school district "has given no serious consideration to including the child in

13

a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." Id. at 1216.

We agree with the Hearing Officer's conclusion that the District fails the first prong of Oberti, and we will address each factor germane to that finding below.

### i.    Steps Taken by the District to Include D.P. in a Regular Classroom

An analysis under this factor is the most damning for the District, as the crux of Parents' case is the District's failure, on several occasions, to seriously consider placing D.P. in a regular kindergarten program with supplemental aids and services. Rather, the District's decision-making concerning D.P. from Spring 2014 until the initiation of the due process proceeding in December 2014 evidences a single minded focus on D.P.'s ASD diagnosis and how D.P., solely due to his diagnosis, needed an autistic support program. Indeed, the record reflects a consistent failure to analyze D.P.'s needs in the personalized manner required by the IDEA.

This approach was first apparent in Mr. Siket's stance from the outset of the placement process that D.P. should be educated in a school with autism support simply because he is a child with autism. (N.T. 78, testimony of Mr. Siket, that "my thought was there you have a child with autism. He may need some autistic support . . . So the thought process was, let's go to Bache-Martin and we can blend his program where he can be in regular education curriculum and if he would happen to need the autistic support, they have that program available to them.") Second, it was clear in Dr. Mendelsohn's recommendations from the first PRR, which came to broad-based conclusions regarding D.P.'s needs based on his diagnosis rather than on any individualized analysis, and which made their way into the original RR, Dr. Wong's revised PRR, and the revised RR. (S-3, S-4, S-6, S-7.) A final example of the District's failure to take steps to include D.P. in a regular kindergarten program is the abrupt and

unsupported change of course in its placement recommendation that took place between the October 9, 2014 IEP meeting and the draft IEP circulated the next day. No support exists in the record indicating why the decision was made to amend the District's position from seeking D.P.'s placement at Bache-Martin, where he could access autism support programs, to seeking his placement at McCall outside of the general curriculum for 52% of each day. Each of these instances belies the District's claim that it attempted to mainstream D.P. to the greatest extent possible.

In Oberti, the Third Circuit noted that where a "school has given no serious consideration to including the child in a regular class with . . . supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." Oberti, 995 F.2d at 1216; see Blount v. Lancaster-Lebanon Intermediate Unit, No. 03-579, 2003 WL 22988892, at *10 (E.D. Pa. Nov. 25, 2003) (finding Hearing Officer erred in applying the first prong of Oberti by failing to require the school to have proposed specific supplementary aids and services); D.E.R. v. Bd. of Educ. of Borough of Ramsey, No. 04-2274, 2005 WL 1177944, at *8 (D.N.J. May 18, 2005) (where student's disabilities impeded his reading skills but student was able to learn easily by listening, school erred in failing to "consider[] and provide[] accommodations that would have allowed [student] to learn using his stronger skills" including "individually tailored methods to address [student's] learning disabilities"). We are in such a posture here, where the record reflects no consideration of the provision of supplementary aids and services to D.P. so that he could attend the regular kindergarten program. Indeed, Mr. Siket does not appear to have considered it prior to advocating for D.P.'s placement at Bache-Martin, nor did any District representative forward it as an option at the October 9, 2014 IEP meeting. The District offers no substantive argument to the contrary, instead focusing its briefing as to Parents' IDEA allegations on the inappropriateness of compensatory education as a remedy.

The rote and cursory nature of the discussion in the October 2014 IEP of why D.P. could not be satisfactorily educated in the regular classroom with supplementary aids and services is further proof of the District's failure to provide D.P. a FAPE. The District states therein that it considered and rejected for D.P. "[t]he regular education environment with supplementary aids and services" because D.P. "needs specially designed instruction in the areas of math, reading behavior and speech/language . . . [and] needs to have the benefit of consultation from the occupational therapist in order to access the general education curriculum." (S-8 at 41.) We agree with Parents that such reasoning is illogical because "specially designed instruction is a subset of supplementary aids and services." (Parents' Mot. at 10.) It therefore appears to the Court the exact sort of "token gesture[]" incapable of fulfilling the IDEA's mandate to meaningfully consider modifications to the general curriculum before deciding that the student must be pulled out. Oberti, 995 F.2d at 1216.

For these reasons, we agree with the Hearing Officer that "the District gave virtually no consideration to including [D.P.] in a regular education kindergarten classroom prior to the start of the 2014-15 school year." (H.O. Rpt. at 17.)

### ii. Benefits to D.P. from Regular Program

The second factor to consider under the first prong of Oberti is how D.P. would benefit from a regular education program compared to how he would benefit from a special education one. Here, D.P. has been assessed to be "an observational learner who benefits from peer modeling of appropriate behavior." (H.O. Rpt. ¶ 3; N.T. 643.) That fact is confirmed by numerous sources, and should have swayed heavily in favor of attempting to place D.P. in a regular kindergarten setting. See Oberti, 995 F.2d at 1216 (emphasizing "those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers"). Conversely, the record does not

reveal how D.P. would benefit, if at all, via his removal to a special education program for 52% of the school day. The dearth of evidence on this point is likely the result of the District's failure to carefully consider the benefits and detriments to D.P. of a regular education program versus a special education one. Instead, it appears that the October 2014 IEP's placement recommendation was the result of the District's attempt to find a middle ground between its initial position that D.P. should be enrolled at Bache-Martin, where he would have access to an autism support class, and Parents' position that he should be at McCall in a regular kindergarten class with supplementary aids and services where needed.

We find that D.P. would have benefitted more from a regular kindergarten experience than from a special education program, because the only evidence relevant to this analysis is that D.P. is an observational learner who progressed by imitating his typical peers.

### iii.    Negative Effect on Other Children

Finally, under <u>Oberti</u> we must consider whether D.P.'s presence in a regular kindergarten class would have had a negative effect on other students. The Hearing Officer concluded that D.P. "did not manifest problematic behaviors that would impede the learning of the other students in the classroom; and, by all indications, [D.P.] has been able to thrive alongside [his] peers." (H.O. Rpt. at 19.) The District does not contest this, and there is no evidence to the contrary.

In sum, under all three relevant factors, we find that "education in the regular classroom, with the use of supplementary aids and services, [could have been] achieved satisfactorily" for D.P.'s 2014-2015 school year and that, therefore, the Hearing Officer correctly concluded that the District violated the IDEA's mainstreaming directive. <u>Oberti</u>, 995 F.2d at 1215. Because D.P.'s educational progress did not require his removal from the general education curriculum, we need not consider the second

prong of <u>Oberti</u>, which inquires into the adequacy of the mainstreaming achieved for children requiring special education.  <u>See</u> <u>id.</u>

> **(2)   Did the Hearing Officer correctly find the District to have violated D.P.'s right to a FAPE by removing D.P. from his kindergarten classroom for 45 to 90 minutes each day?**

In addition to finding a FAPE violation in regard to the District's failure to adequately mainstream D.P., the Hearing Officer further found that the District violated D.P.'s right to a FAPE by unilaterally deciding to remove him from regular education for 45 to 90 minutes daily throughout the 2014-2015 school year.  (H.O. Rpt. at 20-21.)  It is not clear on what basis the Hearing Officer came to that conclusion—whether due to the District's violation of the IDEA's "stay-put" provision, 20 U.S.C. § 1415(j), which mandates that a child remain in his "then-current educational placement" during the pendency of any due process proceedings, or on account of the District's exclusion of Parents from participation in the decision-making process.  Both infractions are procedural in nature, and will only constitute an actionable denial of a FAPE under certain circumstances.  As discussed below, we find sufficient evidence supports a conclusion that the District violated both procedural safeguards, and that such violations amounted to a substantive denial of a FAPE.

### i.   Violation of Stay-Put Rule

The "stay-put" provision of the IDEA, 20 U.S.C. § 1415(j), mandates that "during the pendency of any proceedings conducted pursuant to this section . . . the child shall remain in [his or her] then-current educational placement."  20 U.S.C. § 1415(j).  The Third Circuit has time and again reiterated the IDEA's commitment to preservation of the status quo when parents and school districts disagree.  <u>See</u> <u>M.R. v. Ridley Sch. Dist.</u>, 744 F.3d 112, 118 (3d Cir. 2014) (stating that the stay-put rule "reflect[s] Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved"); <u>Susquenita Sch. Dist. v.</u>

Raelee S., 96 F.3d 78, 83 (3d Cir. 1996) (describing the stay-put rule as representative of a policy choice "that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved").  In order to determine the child's "then-current educational placement," the court looks to his existing IEP.  R.B. v. Mastery Charter Sch., 532 F. App'x 136, 140 (3d Cir. 2013); Jalen Z. v. Sch. Dist. of Phila., 104 F. Supp. 3d 660, 679-80 (E.D. Pa. 2015) (holding that a student's early intervention IEP was his "then-current educational placement" for purposes of the stay-put provision).

Here, D.P.'s "then-current educational placement" was the Early Intervention IEP, which provided that he was "currently attending a regular early childhood program" and that he did not need "preschool special education services."  (S-1 at 58-59.)  It also included a transition plan stating that D.P. would transition to "school-age programs" in September 2014.  (Id. at 37, 62-63.)

After identifying the current placement, the court must decide whether the school district's contested actions had significant enough consequences such that they brought about a change in the student's placement, an analysis which "is something of an inexact science."  In re Educ. Assignment of Joseph R., 318 F. App'x 113, 119 (3d Cir. 2009).  Per instruction from the Third Circuit, "what constitutes a 'change in educational placement' is fact specific and depends upon whether the change is 'likely to affect in some significant way the child's learning experience.'"  George A. v. Wallingford Swarthmore Sch. Dist., 655 F. Supp. 2d 546, 551 (E.D. Pa. 2009) (quoting Joseph R., 318 F. App'x at 119).  Where an existing IEP "calls for public school placement with educational supports to compensate for the child's disability, the stay-put provision may require that local educational authorities not unilaterally attempt to alter the IEP by placing the child in segregated, non-regular education classes."  Michael C. v. Radnor Twp. Sch. Dist., 202 F.3d 642, 650 (3d Cir. 2000) (italics omitted).

Here, the stay-put rule required the District to implement D.P.'s Early Intervention IEP throughout the pendency of the due process proceedings, which were initiated in December 2014. D.P.'s kindergarten teacher, Ms. Keenan, testified that she did implement D.P.'s Early Intervention IEP throughout the year; the issue was that the IEP was woefully outdated and D.P. had mastered the goals therein. (N.T. 411, 758-59.) But, after Parents refused to sign the October 2014 IEP, there was no further collaboration between Parents and the District that could have resulted in a revised IEP for D.P. We appreciate the difficult situation faced by D.P.'s educators, insofar as they were required to implement an outdated IEP that did not correspond to D.P.'s needs at the time. But, we find that other options were available to them short of unilaterally changing D.P.'s placement from regular education 100% of the day to removal from the regular classroom for 45-90 minutes per day. See Raelee S., 96 F.3d at 83 (the stay-put provision "is used to block school districts from effecting unilateral change in a child's educational program").

The instant situation stands in contrast to that present in In re Educational Assignment of Joseph R., No. 04-26, 2007 WL 1314623 (W.D. Pa. May 4, 2007), where the court found that "the unilateral action of [a school district] in providing special education services to [student] in an inclusion classroom, rather than providing one hour per day in a resource room, . . . did not constitute a change in the 'educational placement' of [student]." Id. at *1. In Joseph R., the student's IEP provided for his placement in a regular classroom except for an hour each day when he was to receive learning support in a "resource room." Id. at *2. The school then changed its curriculum as to all students and began solely offering inclusion classes that were team-taught by regular and special education teachers. Id. Because the student was receiving the identical special education services in the new arrangement as were called for in his operative IEP, the district court concluded there had been no unilateral change in the student's placement. Id. at *4-5. Here, in contrast, D.P.'s educational placement was changed drastically—from a wholly general education curriculum to one in which he

was removed from his class and placed in a special education setting for 45 to 90 minutes each day, or six hours per week. That is undoubtedly the type of change "likely to affect in some significant way [D.P.'s] learning experience" as it took him away from his typical peers for a large part of each day. DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 153 (3d Cir. 1984).

We note that the parties dispute the effect of D.P.'s removal for special education instruction. Parents' expert testified that removing D.P. from the regular classroom was detrimental to D.P.'s development because he is an observational learner who learns from imitation, and because the supplemental services from which he could benefit could have been offered in the classroom. (N.T. 858-64 (stating that D.P. "needs to be in a typical classroom with the supports . . . [and] if you really apply and individualize such things as social emotional learning and supplemental aids and services, [then] he'll do great").) The Hearing Officer agreed, finding that D.P. "was deprived of the opportunity to participate with typical peers and engage in observational learning from them for a more than insignificant portion of the school day." (H.O. Rpt. at 21.) The District, on the other hand, contends that D.P. made progress on account of being pulled out of the general classroom. (District Mot. at 11-12.)

But, it is immaterial whether the District's unilateral decision had positive or negative effects; what matters is that the decision brought about a significant change in D.P.'s learning experience. Indeed, the Third Circuit has "consistently stated that the purpose of the stay-put provision is the preservation of the status quo during disputes about a child's educational placement." L.Y. v. Bayonne Bd. of Educ., 384 F. App'x 58, 62 (3d Cir. 2010). Here, D.P.'s "status quo" as of Parents' filing of their due process complaint in December 2014 was indisputably a regular education curriculum, and his removal from that curriculum for 45-90 minutes each day, a disruption. While the Court appreciates that the District was in a difficult situation, as it had an enrolled student with an outdated IEP, encountered resistance from Parents when it attempted to communicate with them, and was

embroiled in the instant proceeding, those facts do not justify the actions taken.  Removing D.P. from a regular education curriculum without consulting Parents ran afoul of the stay-put rule.  We address below why this procedural violation of the IDEA also constitutes a substantive denial of a FAPE.

### ii.    Violation of Parental Participation Requirements

We further find that the District's unilateral decision to remove D.P. from his classroom violated various rights the IDEA affords parents regarding the necessity of involving them in placement determinations.  The Act contains several procedural safeguards to ensure parental participation, and the Supreme Court has stated that the highly "elaborate and . . . specific" nature of these provisions convey the fact that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard."  Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 205-06 (1982) (also describing "the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, . . . [as demonstrative of] the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP").  Specifically, the IDEA and the regulations promulgated thereunder require school districts to give notice to the parents of a disabled child "a reasonable time before the public agency . . . [p]roposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of [a] FAPE to the child."  34 C.F.R. § 300.503(a)(1).  Further, school districts "must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of the parent's child."  Id. § 300.501(c)(1).

The Hearing Officer found that, although the District contended that Parents were aware of the change to D.P.'s program, it was clear that "Parents were again excluded from participating in this important decision, and, significantly, did not understand the nature and extent of that new programming until this due process hearing was underway." (H.O. Rpt. at 20.) We find that the evidence supports this determination. There is no indication that the District involved Parents in the decision-making that led to the change in D.P.'s curriculum; rather, Principal Rock testified that she and other District employees simply "thought that [D.P.] should have that service." (N.T. 149.) There is also no evidence that Parents were given notice of the full extent of the pull-out services being provided to D.P. during his kindergarten year. Although the Court recognizes that the District's actions were taken out of an interest in providing D.P. with the best educational experience possible, it is nevertheless apparent that such actions contravened the regulations cited above. Parents are afforded significant participatory rights under the IDEA, and the District's unilateral decision to pull D.P. out of the classroom throughout the year without discussing it with Parents violated those rights.

### iii.    Substantive Denial of a FAPE

Having concluded that the District's change in D.P.'s educational program constituted a violation of both the IDEA's stay-put provision and its requirements regarding parental involvement, we must analyze whether such violations constituted a substantive denial of a FAPE. A violation of one of the IDEA's procedural safeguards is only a denial of a FAPE "if such violation caused substantive harm to the child or his parents." Alloway Twp. Bd. of Educ. v. C.Q., No. 12-6812, 2014 WL 1050754, at *5 (D.N.J. Mar. 14, 2014) (citing C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010)). Substantive harm, in turn, occurs only if the procedural violation "results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010). Limiting the ability of parents and students to pursue claims based on procedural violations

in this way is important because the compliance of school districts with the IDEA's procedural requirements, "rather than being a goal in itself," is "primarily . . . significant because of the requirements' impact on students' and parents' substantive rights."  Id.

This case stands in contrast to Bayonne, in which the Third Circuit held that, although the school district had failed to respond to certain inquiries made by the parents within the time period mandated under one of the IDEA's procedural rules, such a violation did not amount to a substantive denial of a FAPE to the student.  Id. at 565-66.  Key was the lack of a causal link between the district's delay in responding to the parents' letters and the student's alleged deprivation in educational benefits. In addition, "although [the district's] initial unresponsiveness in the face of [the parents'] concerns was unfortunate and undoubtedly frustrating to them, [the parents] ultimately had an opportunity to participate meaningfully in the creation of an IEP for [the student]."  Id. at 565.  Here, D.P.'s deprivation in educational benefits, in the form of his loss of the opportunity to participate with and learn from typical peers, can "reasonably be traced to" the District's failure to comply with the IDEA's procedural requirements requiring notice to and involvement of parents in decision-making concerning disabled children.  See id.  That is, had Parents been informed of the District's desire to pull D.P. out of the classroom, they could have communicated their dissatisfaction with that course of action and perhaps come to an agreement on a different one.  Further, whereas in Bayonne the parents' exclusion from meaningful participation in the development of their child's educational program was short lived, here Parents were not brought into the fold regarding the details of D.P.'s placement until the due process hearing commenced.

Parents and D.P. suffered "substantive harm" both because of the District's violation of the IDEA's stay-put rule and due to the District's failure to include Parents in the decision-making that led to D.P.'s removal from the regular curriculum for 45 to 90 minutes per day.  Therefore, the Hearing

Officer correctly found that the District denied D.P. a FAPE by its implementation of his program for the 2014-2015 year.

### (3)   Did the Hearing Officer correctly award compensatory education?

Having concluded that D.P. was denied a FAPE by his removal from the classroom every day for 45 to 90 minutes, we turn to whether the Hearing Officer erred in awarding compensatory education to remedy that violation.  The District argues, without citation to any precedent, that the compensatory education award was not supported by the evidence because "the administrative record is replete with evidence of [D.P.'s] progress" across all domains.  (District Mot. at 11-12.)  According to the District, the alleged lack of evidence of a negative impact to D.P. as a result of his removal from the regular classroom, and the fact that D.P. was not denied any special education services, render the award of compensatory education erroneous.  (Id. at 11-12.)  Parents argue that the award was an appropriate remedy for the District's violation of the IDEA's least restrictive environment mandate because the IDEA gives courts the authority to award "all appropriate relief" for such violations and because governing precedent supports such a conclusion.  (Parents' Mot. at 20-22.)

The IDEA grants district courts broad discretion in fashioning a remedy for a denial of a FAPE. 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that the court "shall grant such relief as the court determines is appropriate").  Determining what relief is warranted is a case by case analysis under which the "court will evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for a school district's past violations of his or her rights under the IDEA and develop an appropriate equitable award."  Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 720 (3d Cir. 2010).  Compensatory education, or the "replacement of educational services the child should have received in the first place," is one possible remedy available for the deprivation of the right to a FAPE.  Ferren C. v. Sch. Dist. of Phila., 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009) (quoting Reid v. Dist. of Columbia, 401 F.3d

516, 518 (D.C. Cir. 2005)); <u>Lester H. v. Gilhool</u>, 916 F.2d 865, 872-73 (3d Cir. 1990). There is no requirement that "the district's behavior . . . rise to the level of slothfulness or bad faith" for compensatory education to be an appropriate remedy. <u>M.C. v. Cent. Reg'l Sch. Dist.</u>, 81 F.3d 389, 397 (3d Cir. 1996). Where compensatory education is warranted, the student "is entitled to [it] for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem." <u>Id.</u>

The District frames the issue in terms of the provision to D.P. of special education services, rather than the denial of any such services, which under its reasoning compels the conclusion that compensatory education is inappropriate. While we appreciate the difference between this case and those situations in which a school has clearly taken an educational opportunity away from a student, <u>see, e.g.</u>, <u>P.N. v. Greco</u>, 282 F. Supp. 2d 221, 236 (D.N.J. 2003) (granting compensatory damages to student as a remedy for the district's "complete cessation of schooling for the disabled student" for 17 days), we agree with the Hearing Officer that D.P. <u>did</u> suffer a deprivation for which compensatory education is an appropriate remedy. He was deprived an educational opportunity in the form of not being able "to participate with typical peers and engage in observational learning from them for a more than insignificant portion of the school day." (H.O. Rpt. at 21.)

Here, D.P. was removed from his regular kindergarten classroom for 360 minutes per week beginning in mid-October 2014. (H.O. Rpt. ¶ 50.) The Hearing Officer applied the standard set forth in <u>M.C.</u> to find that D.P. was owed compensatory education for the total number of hours he was removed from the regular education environment, which the officer found to be 360 minutes per week from mid-October 2014 through the end of the school year. (H.O. Rpt. at 23-25.) We agree that D.P. was denied a FAPE via his removal from class, that compensatory education is warranted as a remedy, and that, affording due weight to the findings of the Hearing Officer, the calculation of the number of hours owed was correct.

**(4) Did the Hearing Officer correctly find the District discriminated against D.P. on the basis of his disability?**

The parties next seek judgment on the Hearing Officer's finding that the District's failure to provide D.P. a FAPE constituted a violation of both Section 504 of the RA and the ADA. (H.O. Rpt. at 21.) The District argues, again with no case support, that the record lacks any evidence that D.P.'s ASD diagnosis was the basis for the District's decision to remove D.P. from the regular education curriculum. (District Mot. at 12-14.) Parents contend that the Hearing Officer correctly found the District's initial placement determination and removal of D.P. from regular education violations of Section 504 and the ADA because such actions were taken with the awareness "of D.P.'s federally protected right to be educated in the most integrated setting and [of] the substantial likelihood that removal to a separate classroom in a different school building would violate that right." (Parents' Mot. at 18-20.)

The RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program" receiving federal funding. 29 U.S.C. § 794(a). Section 504 extends this prohibition to public school systems. Id. § 794(b)(2)(B). The ADA contains nearly identical language, and the Third Circuit has held that the same standards govern claims arising under both statutes. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282-83 (3d Cir. 2012) (stating that "the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same"). To make out a claim under either statute, a plaintiff must show that he "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009). There is no dispute that D.P. "has a disability" and "was otherwise qualified to participate in a school program;" rather, the parties disagree over whether he was denied any educational benefits or subjected to discrimination as a result of his

disability. The "negative prohibition" under both the RA and ADA "is similar to the IDEA's 'affirmative duty' and also requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" Ridley, 680 F.3d at 280 (quoting W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995)).

Because the RA and ADA impose the same requirement of providing a FAPE as mandated under the IDEA, we need not engage in in-depth analysis of those statutes. Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007) (holding that "when a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA" and "it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability"); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 253 (3d Cir. 1999) (stating that "there are few differences, if any" between the affirmative duty to provide a FAPE under the IDEA and the RA's and ADA's negative prohibition) (superseded by statute on other grounds as stated in D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 499 (3d Cir. 2012)). Therefore, we hold that the Hearing Officer correctly found the District to have violated the RA and ADA by failing to adequately mainstream D.P. and by removing D.P. from his kindergarten classroom for 45 to 90 minutes each day.

### (5) Did the Hearing Officer correctly find the District did not retaliate against Parents?

The District also moves for judgment on the Hearing Officer's conclusion that the District did not retaliate against Parents for their advocacy on behalf of D.P. (District Mot. at 14-15.) Parents assert that the Officer erred, and that there was sufficient evidence in the record to support a finding of retaliation under the IDEA, RA, and ADA.[2] (Parents' Response at 11-16.)

---

[2] As for Parents' argument that the District retaliated against them in violation of the IDEA, the Third Circuit has not yet addressed whether such a claim is cognizable. See Hesling v. Avon Grove Sch. Dist., 428 F. Supp. 2d 262, 274 (E.D. Pa. 2006). Courts in this Circuit have come to different conclusions on the issue, with Judge Pollak in this District finding that

The *prima facie* elements for a claim of retaliation under the ADA are the same as those for a claim under Section 504 of the RA. Derrick F. v. Red Lion Area Sch. Dist., 586 F. Supp. 2d 282, 299 (M.D. Pa. 2008). Under both statutes, plaintiffs must show "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). A plaintiff can establish the requisite causal connection by proving either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing." Id.

Here, Parents allege several adverse actions. They claim that the District limited Mrs. Post's ability to volunteer in D.P.'s classroom, threatened truancy charges against Parents, and participated in the efforts of the Home-School Association to remove Mrs. Post from her position as an officer. (H.O. Rpt. at 21.) We agree with the conclusion of the Hearing Officer that none of these actions constituted retaliatory actions. First, there is no indication that the District's decision to disallow Mrs. Post from volunteering in DP's classroom was animated by retaliatory impulse; rather, it is uncontested that Mrs. Post did not provide certain clearances required by the District and that was the reason for her inability to volunteer in DP's classroom. (N.T. 1183, 1244-45.) We agree that "the record at best establishes that the District did not consistently enforce its policy on clearances at [McCall]," and that no basis exists to find that the District's enforcement of said policy against Mrs. Post was retaliatory in nature. (H.O. Rpt. at 22.)

---

"a parent may pursue the remedies available under the IDEA . . . for retaliation which violates his or her rights under the IDEA," and Judge Debevoise in the District of New Jersey dismissing such a claim, holding that "because the IDEA contains no retaliation provision, [the] [p]laintiffs can have no viable distinct retaliation claim under the IDEA." Compare id. with P.N. v. Greco, 282 F. Supp. 2d 221, 237 n.3 (D.N.J. 2003). Because we conclude that the evidence reveals no retaliatory actions taken by the District, we need not decide whether a retaliation claim exists under the IDEA.

Second, the District's threat to bring truancy charges against Parents cannot qualify as a retaliatory action where no charges were ever brought and there is no evidence that the threats were made because of Parents' advocacy on behalf of D.P.  (H.O. Rpt. at 22; N.T. 1200-01.)  Finally, the evidence does not support a finding that the District participated in the efforts of the Home-School Association to remove Mrs. Post from her position as officer in order to retaliate against her.  (H.O. Rpt. at 22-23.)

## VI.    CONCLUSION

For the reasons explained above, Parents' Motion for Partial Judgment on the Administrative Record is granted, and the District's Motion for Partial Judgment on the Administrative Record is denied.

O:\CIVIL 15\15-4501 SCH. DIST. PHILA V. POST\15CV4501 MEMO RE JUDGMENT ON ADMIN RECORD.DOCX